IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 15-cr-00245-WJM

UNITED STATES OF AMERICA,

   Plaintiff,

v.

1. **MATTHEW SCOTT HOLT**,
2. JORDAIN LARSEN

   Defendant.
_____

### MOTION FOR BELOW-GUIDELINE, DOWNWARD VARIANCE SENTENCE
_____

Matthew Scott Holt ("Mr. Holt"), by and through his attorney, David E. Johnson, hereby files this Motion for Below-Guideline, Downward Variance Sentence pursuant to 18 U.S.C. § 3553(a), requesting a sentence of <u>300 months (25 years)</u>, and in support thereof states as follows:

### INTRODUCTION

The statutory sentencing range in this case is 15 to 90 years. The entire range is available to this Court. The advisory guideline range is computed to be 1080 months (90 years), the statutory maximum sentence. *See* Doc. No. 81 ("PSR") at ¶ 149. That range is merely advisory, *United States v. Booker*, 543 U.S. 220 (2005), and the range of sentencing options is broad. *See, e.g., Spears v. United States*, 555 U.S. 261 (2009); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Rita v. United States*, 551 U.S. 338 (2007); *Cunningham v. California*, 549 U.S. 270 (2007).

1

This Court may not presume that a within-Guideline sentence is appropriate, *Rita*, 551 U.S. at 351, nor may it put its "thumb on the scales" in favor of a Guideline sentence, *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring).  A district court must "give respectful consideration to the Guidelines" but is permitted "to tailor the sentence in light of other statutory concerns as well."  *Kimbrough*, 552 U.S. at 101 (internal quotations omitted).  After calculating and considering the advice of the Guidelines, the court must then turn to an "individualized assessment" of Mr. Holt's case "based on the facts presented."  *Gall*, 552 U.S. at 50.  Ultimately, this Court's directive is to ensure that a sentence not be "greater than necessary" to satisfy Section 3553(a).

Similarly, when making these individualized assessments, sentencing courts are free to categorically disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based upon a contrary view of what is appropriate under Section 3553(a).  This includes the freedom to merely disagree with a guideline's computations, and the "policy decisions" that are contained in the guideline. *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011) (holding that, post-*Booker*, a sentencing court may impose a non-guidelines sentence based on a disagreement with the Commission's views); *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (confirming *Kimbrough's* holding that courts may vary from guidelines based solely on categorical disagreements with the Commission's Guideline).

In this case, a below-guideline, downward-variance sentence should be imposed. As explained below, the sentence that best complies with Section 3553(a) is <u>300 months (25 years) imprisonment</u>, followed by <u>lifetime supervised release</u>.

**ARGUMENT**

**I.      The Guideline is Excessive, Resulting in a Statutory Maximum Recommendation.**

Let's start with the Guideline calculation, which is the "starting point" for sentencing.  *Gall*, 552 U.S. at 49. This Court should receive little guidance in this case from the advisory guidelines.  *See also infra* Part IV.  The reason for this is simple: they are excessive and do little to assist this Court in finding the appropriate sentence within the statutory range of 15 to 90 years.

Were it not for the Guideline Table being capped at offense level 43, the guideline would recommend an offense level 51.  *See* PSR at ¶¶ 97, 98 (49 + 5 = 54 -3 = 51); *See also* Plea Agreement at 27.   Thus, this case perfectly illustrates the guideline's untrustworthiness.  It is the perfect example of an excessive guideline that ratchets up offense levels, often unmoored from culpability or any Section 3553(a) factor.   For example, it is true that Mr. Holt and Ms. Larsen sent images/videos to each other via Skype or phone text.  No other distribution occurred, yet the guideline calls for a 2-level increase for this.  *See* PSR at ¶¶ 62, 71.   For example, a computer was used via Skype.  With no connection to Section 3553(a), the guideline nevertheless calls for a 2-level increase for this.  *See* PSR at ¶ 63.  The Guideline cannot be relied on.

As is common, the guideline recommendation in these type of cases is life.  As an initial matter, therefore, the point here is simple: the advice of the guideline should receive little weight.  This topic will be returned to in Part IV of this Motion.

**II.     Lack of Wide-Spread Distribution**

In many cases involving the production of child pornography, there is an additional harm done, magnifying the abuse or molestation of the minor.  In many cases, the videos

and/or images that are produced are then uploaded onto a website, a viewer "bulletin board", social networking sites, or peer-to-peer programs.  Many child pornography producers, in fact, themselves create websites to ensure wide-spread distribution of their productions.  The images are out in the world, available to be viewed by countless others, and, yet further, re-distributed untold amounts of time.  Such distributed images then form the basis of future possession (as opposed to production) of child pornography offenses. In essence, the child pornography producer has added to the "supply" of child pornography, to be viewed by other child pornography offenders.

That often-common occurrence and concern did not happen in this case.  *See* Doc. No. 88, Attachment 1 at 19 ("he unequivocally denies ever posting, sharing, trading or otherwise publishing any of the files they had produced").   Mr. Holt did not distribute the images or videos he produced to anyone other than Ms. Larsen.  It was for her own viewing; not the viewing of the world.

**III.   A Life Sentence is greater than necessary; 25 years complies with 3553(a).**

Both the government and the PSR author seek, in essence, a life sentence for Mr. Holt.   The PSR author admits as much.   *See* PSR at R-6 ("This is basically a life sentence").   It is the second most serious punishment available in our criminal justice system – the only more harsh one being death itself.  Here, while Mr. Holt's offense can be described as nothing short of --- as this Court stated at Ms. Larsen's sentencing --- a "horrific nature", a sentence short of *de facto* life imprisonment should be imposed.

**A.   Forensic Psychosexual Evaluation**

Mr. Holt was examined by Dr. Chuck Denison, a licensed forensic psychologist with extensive training and experience in the specialty of forensic psychology.  He further

specializes in the investigation of sexual assault, sexual deviance in adults and adolescents, Internet crimes against children, and the assessment of victims of sex crimes. He has been qualified as an expert witness in both Federal and State District Courts.

His report has been submitted for this Court's review. *See* Doc. No. 88, Attachment 1 (hereinafter "Dr. Denison Report"). It merits this Court's full review, as it provides a comprehensive look at Mr. Holt, his history and characteristics, how they relate to his offense, as well as Dr. Denison's diagnoses, risk assessment and conclusions. "This assessment used a combination of standardized and customized techniques, intended to provide a valid and even predictive profile of the examinee." *Id.* at 4. The report identifies 9 different procedures that were included in Mr. Holt's evaluation, which yielded "a multi-faceted psychological profile for the examinee." *Id.* at 8-10.

Dr. Denison's evaluation and subsequent report is thorough, detailed, and objective. As explained in the report: "Without regard to whether a professional represents the prosecution, defense, law enforcement, child protective services or other discipline, it is in our common interest to consider these facts dispassionately so that we can achieve the most accurate conclusions about a defendant or convicted sex offender." *Id.* at 7.

That is what Mr. Holt seeks: a dispassionate assessment of his case. This Court should not overlook that there are in fact reasons that a *de facto* life sentence --- including one of 90 years or even 45 years (as in Ms. Larsen's case) --- should not be imposed.

**B.    Polygraph Examination, combined with other aspects of Dr. Denison's Report.**

As a part of Dr. Denison's evaluation, Mr. Holt underwent a polygraph examination, conducted by a certified polygraph examiner and Dr. Denison. The following questions were asked:

1)  Except for Jordain [Larsen], since the age of 18 have you ever had sexual intercourse with another person?

2)  Are you the person who initiated the production of child pornography?

3)   Have you ever used electronic devices for sexual communication with Minors?

4)   Since you turned 18, did you ever have any sexual contact with any other children except for [the Minor Victims]?

5)  Except for your current case, have you ever produced child pornography?

6)  At any time when you were alone [Minor #1], did you ever have anal or oral sex with him?

*See* Dr. Denison Report at 20.  Mr. Holt answered "no" to each question.  The conclusion of the examination was "No Deception Indicated".  *Id.*

This demonstrates a number of important points.  Perhaps most significant, Dr. Denison concluded: "**By all measures I can apply, Mr. Holt's overt sexual deviance began with his meeting of the codefendant.**"  Dr. Denison Report at 16 (emphasis added).  More specifically are a number of important points and subjects.

First, Mr. Holt's first experience with sexual intercourse as an adult was with Ms. Larsen; he has never been involved in a relationship with another male; and from the ages of 16 to 32, he had no kind of sexual interaction with any other person.  Dr Denison

Report at 13 & 15-16 (Mr. Holt's History of Sexual Behavior).  He had experienced sexual abuse as a minor.  *See* PSR at ¶ 110.  This translated into an indifferent view towards sex.  In discussing with Dr. Denison his involvement with child pornography, Mr. Holt expressed "he experienced a sense of 'understanding' what he saw in child pornography; in contrast, he had no adult sexual experience and thus had little understanding of adult pornography."  Dr. Denison Report at 16.  Generally speaking, Mr. Holt was "completely disinterested" in sex.  *Id.* at 15.

Ultimately, Mr. Holt was found to have "a history of social fears and behavior restricting responses. This would be consistent with the fact that Mr. Holt has had few friendships in his life.  Overall, his lifespan has been characterized by a low level of depressed mood and low positive emotions."  Dr. Denison Report at 14.  Psychological testing profiles confirmed this conclusion.  *Id.* They further show a person who "thinks very poorly of himself" and "who is poorly equipped to have successful interpersonal relationships" due to social discomfort and worry.  *Id.* at 21.

Second, Mr. Holt did not initiate producing child pornography.  To the contrary, the psychological profile found Mr. Holt to be "impulsive" and, more importantly, "**interpersonally 'passive'**" in that "his is likely to acquiesce to the desires of others, even if he knows his responses are inappropriate."  Dr. Denison Report at 21 (emphasis added).  "He is characteristically dependent on others for direction, and thinks lowly of his own abilities."  *Id.*  In sum, "Mr. Holt is a man who suffers from long-term social avoidance and an inability to form traditional relationships.  He is by nature **anxious, avoidant, and prefers that someone else take the lead.**"  *Id.* at 26 (emphasis added).  That comes through in various texts messages sent in this case. That is what happened in this case.

<u>Third</u>, Mr. Holt has never been an on-line sexual predator talking with minors. His conduct is much more able to be monitored in a supervisory setting, such as lifetime supervised release.

<u>Fourth</u>, as the PSR author insinuated in her "Justification" section, there is always a concern in child pornography cases (production and possession alike) that there is a long history of unknown hands-on victims. That is not the case with Mr. Holt, as the polygraph demonstrates.

<u>Fifth</u>, similarly, Mr. Holt's production of child pornography began and ended with this case. There are not unknown other images/videos that he produced.

As noted by Dr. Denison: "[I]t is important to note that Mr. Holt's sexual behavior in this case is, indeed, limited *only to this case*. He passed a polygraph examination that largely focused on potential sexual history outside the parameters of the instant offense and the identified victims. The polygraph rendered a robust level of confidence, in that the validity scores were high. Perhaps the most useful finding of this polygraph is that it indicates a low probability of sexually deviant crime history extraneous to the instant case." Dr. Denison Report at 29.

<u>Sixth</u>, Ms. Larsen was present during Mr. Holt's abuse of the minor victims. Consistent with this passive psychological profile, Mr. Holt was adamant that he did not engage in sexual contact when Ms. Larsen was away. *See* Dr. Denison Report at 18.

**C.   History and Characteristics of Mr. Holt.**

Dr. Denison's report contains a detailed description of Mr. Holt's history and characteristics, again warranting a thorough review. *See* Dr. Denison Report at 10-16. The PSR contains an abbreviated version of much of this information. PSR at ¶¶ 108-

141.   Perhaps best summarizing his history is Mr. Holt's statement: "I have been depressed before I even knew what the word 'depressed' meant." Dr. Denison Report at 14.   As described by Dr. Denison: "Consistent with the MMPI results, this examinee suffers from depression and anxiety." *Id.* at 21.

Mr. Holt was born to a father who hated him.  His father was both physically and sexually abusive towards Mr. Holt.  At the age of 5 years old (approximately), Mr. Holt tried to jump off the family residence's balcony.  *Id.*; *see also* PSR at ¶ 130.  The sexual abuse began around age 4 or 5 and continued until age 9 or 10. *See* PSR at ¶ 110. By the age of 6 or 7, his father was anally raping Mr. Holt.  "He wanted me to pay for existing," expressed Mr. Holt.  "He didn't want me to exist.  So much of it doesn't make sense."  Dr. Denison Report at 11.   Mr. Holt interpreted his father's actions as some form of "punishment for me."  *Id.*

Mr. Holt's mother and father separated when Mr. Holt was approximately 10 years old.  His mother and Mr. Holt moved to Florida with Mr. Holt's grandmother.  According to Mr. Holt's brother, their grandmother was physically and emotionally abusive towards the boys.  PSR at ¶ 111.  Mr. Holt described to Dr. Denison how his grandmother would make the boys strip off all their clothing, and she would hit them on their bare butts with her slipper.  Dr. Denison Report at 12. It was during this time that Mr. Holt's father committed suicide.  PSR at ¶ 111; Dr. Denison Report at 12.  Mr. Holt has never shed a tear over his father's death.  *Id.*

After a year residing with his grandmother, his mother moved out on her own.  It was then when a boyfriend of her's, Terry Hashman, came into Mr. Holt's life.  In essence, from ages 14 to 18, "life was hell" according to Mr. Holt.  Dr. Denison Report at 12.  Mr.

Holt's brother also confirmed that Mr. Hashman "was abusive, an alcoholic, a drug user, and a very bad person."  PSR at ¶ 113. Terry also tried to force Mr. Holt to smoke crack. Dr. Denison Report at 14; PSR at ¶ 133.

Terry Hashman wasn't the only person introduced to Mr. Holt's life.  Another man, Ken, who was referred to as Terry's dad (not a real life dad, but a "prison dad") also began to live with Mr. Holt.  *See* Dr. Denison Report at 12; PSR at ¶ 114.  After an unsuccessful attempt at raping Mr. Holt was foiled by his brother's interruption, a month later Ken anally raped Mr. Holt.  *Ibid.*

As summarized by Dr. Denison: "[Mr. Holt] lived in a highly anti-social home environment, with men brining stolen goods into the home and constantly getting into trouble.  In spite of this context, [Mr. Holt] never participated and never got into legal trouble."  Dr. Denison Report at 13.  Until the instant offense, Mr. Holt had never been arrested, let alone seen the inside of a jail.  "Despite everything," Mr. Holt says, "I always thought I was a pretty good kid."  *Id.* at 15.

Mr. Holt developed a disinterest in sex, *id.* at 15, and a chronic "hatred toward men."  *Id.* at 14.  "**He experiences self-criticism, low self-esteem and emotional neediness.  His sexuality is repressive to him, and he wishes to escape his own sexual discomfort.**"  Dr. Denison Report at 23 (emphasis added).  The following passage from Dr. Denison's "Conclusions and Discussion" is particularly telling:

> While a personal history of sexual victimization does not excuse offense behavior, it is an important piece in the puzzle when understanding the factors that result in the kind of crime committed by Mr. Holt. I hope the reader will review the section on Mr. Holt's personal and sexual history, above. What it shows is that his sexual experience—his model for understanding sex, if you will—is virtually all **maladaptive**. He began his life with multiple incidents of sexual

> victimization, by multiple perpetrators. This led to a man who
> did not have a normal sex life or relationships as an adult. In
> fact, he had no sex life as an adult, not in the traditional,
> romantic sense. His first experience of sexual intercourse
> was with Jordain Larsen. Not a normal type of love partner,
> by any means.

*Id.* at 25-26 (emphasis added).

### D.   Psychological Assessment: A crime of opportunity; not a Sociopath or a predator.

Mr. Holt expresses significant remorse, regret and depression over his offenses. "Far from being defensive or defiant about his situation, he believes he is wrong and deserves punishment in life."  Dr. Denison Report at 21.  "Mr. Holt well understands how much damage his sexuality has caused to himself and others."  *Id.* at 23.  "Mr. Holt himself identifies his sexual offense behavior as 'wrong' and harmful in multiple ways."  *Id.* at 26. And he "is motivated to address his deviance."  *Id.* at 30.

When interviewed for approximately 3 hours by law enforcement, Mr. Holt at times was in tears.  Troubled at looking at images shown to him of Minor Victim 1, he commented: "it reminds me of everything I shouldn't have done. . . . No kid should have to go through that.  I'm very sorry that I fed in to that. I'm sorry that I hurt [Minor Victim 1] . . . I can never change what happened."

On that subject, a common question arises: how can someone who was themselves sexually victimized turn around and inflict the same victimization on others? Dr. Denison provides helpful insight:

> In some sense it appears counter-intuitive, that a person who
> sexually suffered at the hands of an adult later would do the
> same. He should, and does, know how harmful this is. Yet this
> is precisely the pattern of behavior I have seen in so many
> cases over the years. To some extent, behavioral science
> shows us that humans are prone to perpetuating "familiar"

> behaviors, even if they are maladaptive. There are, of course, many people who grow up to prevail over the terrible conditions of their past. Why some do and some don't is difficult to answer. We do know that interventions such as cognitive and behavioral training can have a rehabilitative effect. In Mr. Holt's case, I think he will actually be a good candidate for such rehabilitation.

Dr. Denison Report at 29.

Ultimately, Mr. Holt was diagnosed as having "a chronic condition" known as Dysthimic Disorder. "This is essentially a low-level and ever-present condition of depressed mood and lack of positive emotion." Dr. Denison Report at 26. A diagnose of "Anxiety Disorder, perhaps Generalized Anxiety" was also discussed. *Id.*

Importantly, Mr. Holt is neither sociopathic nor a predator. As it relates to the former, "[t]his is probably the lowest PCL-R score I have ever seen in a hands-on sexual offender," observed Dr. Denison. *Id.* at 22. Regarding the later, Dr. Denison's observations are equally telling: "[W]e have two people here [Mr. Holt and Ms. Larsen] who were very much feeding on one another's pathologies." Report at 27. It was a "meeting of the minds" in the most horrible way. *Id.*

Further, Dr. Denison was "compel[ed] to confirm Mr. Holt's passive and dependent orientation toward sex (and toward life overall)." This is significant in the context of this case:

> As bad as the crime itself is, he most certainly allowed himself to be ever more entrenched in **a sexual opportunity that was *presented to him*.** In this sense, he acted as an opportunist, not a predator. His psychosexual deviance put him at risk, and opportunity triggered his crime. This, I believe, is the most accurate representation of Mr. Holt's sexual crime.

Dr. Denison Report at 27 (italics original; bold added).

Several of the text messages in this case confirm Dr. Denison's observations and conclusions.[1]   In May 2014, Mr. Holt expressed anxiety about engaging in sexual acts with Ms. Larsen's children; she reassured him it was okay.  Mr. Holt expressed a desire to kill himself;[2] Ms. Larsen responded with difference between her and him: "The only difference is that you [Holt] want to be alone and leave this earth and I want to be held and loved."  Later on, Mr. Holt texts "I just need to get out of your life."  In July 2014, Mr. Holt texts Ms. Larsen: "Maybe I should just get castrated... Then I won't worry about sex with anyone." Ms. Larsen responds "Please dont" and asks Mr. Holt to describe to her how he anally penetrated Minor Victim 1.  Mr. Holt insists it was fantasy talk; it is what Ms. Larsen liked to hear.  In another text to Mr. Holt later in July 2014, she fantasized about instructing Mr. Holt to "Ooo.. slowly kiss [Minor Victim 1's] penis"; an hour later Ms. Larsen says: "I have my little interests emerging again . . . Its something I've held back for a long time.  Thinking I was horrible for thinking of it. Never told anyone before you."

### E.     Risk Assessment

Objective as he is, Dr. Denison had concerns about Mr. Holt.  He found Mr. Holt "to be at high risk for sexual deviance and potential recidivism."  Dr. Denison Report at 28.[3]  Nevertheless, there was a caveat: Mr. Holt "is also a good candidate for treatment

---

[1]   "Even in some of his instant messages with [Ms.] Larsen, his moral struggle and remorse seem to mentally cohabit with his sexual fantasies."  Dr. Denison Report at 30.

[2]   Mr. Holt recalls frequently talking with Ms. Larsen about wanting to kill himself. However, he never would; as he told Dr. Denison, "[h]e is not going to end his life the way his father did."  Dr. Denison Report at 14.  He explained to the PSR author about thoughts of killing himself, including "bouts" where it was more serious.  PSR at ¶ 131.

[3]   According to the MSI measure, absent treatment, he is a high risk for sexual abuse towards children.  Dr. Denison Report at 23 ("pegged the scale" of the Molester Comparison Scale).   According to the SVR-20 measure, he is also at a high risk for future sexual offense behavior.  *Id.* at 24. This is true even compared to only other

intervention.  With time and treatment, there is a good chance that his risk level could be mitigated to moderate risk."  Dr. Denison Report at 28.  Dr. Denison believes that Mr. Holt is not one "to go out looking for child victims in the community," but the risk is that he is "vulnerable to opportunities."  *Id.*   At the end of the analysis, however, Mr. Holt is "a good candidate" for treatment and rehabilitation.  *Id.* at 29.

The risk identified by Dr. Denison can be best addressed via a 25 year imprisonment sentence followed by lifetime supervised release.  Mr. Holt is currently 35 years old, with approximately 15 months of presentence confinement.  Mr. Holt would be in his late-50's when released from a 25 year term.  He will then for the rest of his life be under the supervision of a Probation Officer, with restrictive conditions of supervised release, including mental health treatment, sex offender treatment, restricted and then highly monitored computer usage, prohibited contact with children under the age of 18, and a requirement to inform the probation officer of his relationships, employment or volunteering activities.  *See* PSR at R-4, R-5.  These restrictive conditions accomplish several Section 3553(a) objectives; equally important, they will mitigate the risk posed by Mr. Holt, causing a *de facto* life sentence to be unnecessary.

### F.   Conclusion as to Psychosexual Evaluation

Dr. Denison concludes his report with a "Closing Discussion", one that summarizes his view of this case, Mr. Holt, and the circumstances that brought Mr. Holt into federal court.   While his findings "do little to compliment Matthew Holt, neither on psychological

---

hands-on offenders.  *Id.*  MnSOST-R places him in "the moderate to high risk category" *Id.* at 25.

health nor self-control," Dr. Denison Report at 30, there are encouraging finding and mitigating circumstances.

Recall that the PSR assigns "the majority" of abuse on Mr. Holt.  PSR at R-5. That's too easy.  As is often true, it's not that simple.   Dr. Denison's observations are nuanced:

> Much has been made of the topic of whether it was Mr. Holt or his co-defendant who was chiefly responsible for initiating sexual abuse upon the children. The evidence shows that Ms. Larsen did so before Holt was physically in the picture. On the other hand, once he was physically present in Colorado, he was both a sexual perpetrator and the co-producer of child pornography.  Without a doubt, Ms. Larsen did not have the authority or influence over Mr. Holt to make him participate. All indications are that he did this on his own volition. He had many, many opportunities to essentially "back out" of a relationship that became increasingly deviant with time.
>
> Conversely, after reviewing this case in great depth I found that Mr. Holt's codefendant has consciously attempted to throw him under the bus, so to speak. I am confident in the findings, that Mr. Holt was a co-conspirator in deviance here, but **he was not the ringmaster**. **Virtually every aspect of his psychological picture reveals him as a man who is unstable, dependent and a poor decision-maker about all things sexual. What it does not support is the notion of a man who initiated and insisted on these crimes in a unilateral manner**.

Dr. Denison Report at 28-29 (emphasis added).  In essence, Mr. Holt and Ms. Larsen were both clearly troubled individuals who "found one another through internet-based formats that are notorious for fostering sexual deviance in our society."  *Id.* at 29.

Over the course of the past year, Mr. Holt – perhaps for the first time – has prepared and motivated himself to face his demons.  He is 35 years old, with a troubled and often toxic past.  Significant issues, heretofore repressed, have been brought to the fore and shown the light of day.  That is the first step.

Next, a lengthy prison sentence is anticipated and warranted.  It need not be a de facto life sentence.  It need not be one as severe as 45 years (the sentence imposed on Ms. Larsen), which Mr. Holt also views as a de facto life sentence.  Instead 25 years is harsh; it is lengthy; and it will be followed by lifetime supervised release.  It is the punishment that is sufficient but not greater than necessary to comply with Section 3553(a).

**IV.  Sentencing Guidelines and Avoiding Unwarranted Disparities: Deconstructing the Guideline and its Disparity-Causing Results.**

In addition to the nature of the offense and history and characteristics of the defendant, the Court must consider the Sentencing Guidelines and the need to avoid unwarranted disparities.  *See* 18 U.S.C. § 3553(a)(4-6).  But, when the Guidelines are not the result of the Commission's exercise of its characteristic institutional role, as when they are not based on the empirical approach, a court is not presented with the "ordinary case," in which the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve Section 3553(a)'s objectives.  *See Kimbrough*, 552 U.S. at 109.  Here, because the production guideline was not the product of the Commission's traditional empirical approach, the sentence recommended by that guideline deserves less deference and should be rejected.

**A.  The history of Section 2G2.1**

When initially created, Section 2G2.1 had a base offense level of 25.  *See* U.S.S.G. § 2G2.1 (1987).  A two-level increase was provided if the minor was under twelve years old.  See *id*.  Thus, as the guidelines stood as initially adopted, Mr. Holt would have a base offense level of 25 and he would have a two-level increase because the minor was under twelve years old.  Assuming each count was a different group, he would receive a

16

three-level grouping adjustment. After a three-level reduction for acceptance of responsibility, his total offense level would be 27. With a criminal history category of I, his guideline range would be 70-87 months. At the time, for a first time offender, the statute contained a maximum penalty of ten years, with no mandatory minimum term of imprisonment. *See* 18 U.S.C. § 2251(a) & (d) (1987).

Effective November 1, 1990, the Commission changed the enhancement that had previously provided for a two-level increase when the minor was under twelve years old. *See* Amendment 324. Instead of the two-level increase, the Commission amended Section 2G2.1 to provide for a four-level increase if the minor was under twelve years old, and a two-level increase if minor was under the age of sixteen years old. See *id.* Moreover, if the defendant was a parent, relative, legal guardian, or otherwise had custody or supervisory care of the minor, an additional two-level enhancement was provided. See *id.*

As the Reason for the Amendment, the Commission merely stated that "[t]his amendment revises subsection (b)(1) to provide distinctions for the age of the victim consistent with § 2G1.2, and adds subsection (b)(2) to provide an increase for defendants who abuse a position of trust in exploiting minor children." *Id.* Since its enactment, and presumably based upon an analysis of historical sentencing patterns, Section 2G1.2 had contained the four and two level enhancements, depending on the age of the children. See U.S.S.G. § 2G1.2 (1987). In contrast, and again presumably based upon historical sentencing patterns, Section 2G2.1 (i.e. the guideline applicable here) had only ever had the two level enhancement if the minor was under twelve years old.

Nothing in the Reason for the Amendment indicates that judges had been finding Section 2G2.1's two-level enhancement too lenient, nor explains why Section 2G2.1 needed to be amended to match Section 2G1.2.   Similarly, the Reason for the Amendment fails to assert that earlier sentences were too lenient for defendants who had abused their familial relationships, thereby justifying an additional two-level increase in such situations.   Rather than relying on study or empirical research, the Commission simply amended the Guideline with minimal explanation.

Based upon the 1990 Amendments, defendants like Mr. Holt would now see their total offense level (after acceptance) raised from 27 to 31.  With a criminal history category of I, the Guideline range would be 108-135 months.  Thus, without any change in the statute, and without any assertion that earlier sentences were simply too lenient, defendants like Mr. Holt saw the bottom of their guideline range increase by more than fifty percent.   The Commission's sole justification for such a drastic increase: "This amendment revises subsection (b)(1) to provide distinctions for the age of the victim consistent with § 2G1.2, and adds subsection (b)(2) to provide an increase for defendants who abuse a position of trust in exploiting minor children."  Amendment 324.

In 1995, Congress enacted the Sex Crimes Against Children Prevention Act of 1995, Pub. L. 104-71, 109 Stat. 774, directing the Commission to enhance the base offense level by two for violations of 18 U.S.C. § 2251, and to provide a specific increase of two-levels if a computer was used to transmit the notice of advertisement to the intended recipient or to transport or ship the visual depiction.   In response, the Commission increased Section 2G2.1's base offense level to 27, and added a two-level enhancement if a computer was used to solicit the minor's participation.  *See* Amendment

537, effective November 1, 1996.  The sole reason for these increases was that the Commission was responding to Congressional directives.  Again, no empirical study supports the increase.  Just as in *Kimbrough*, the result is a guideline which "do[es] not exemplify the Commission's exercise of its characteristic institutional role."  *Kimbrough*, 552 U.S. at 109.

Thus, by November 1, 1996, Mr. Holt's total offense level (after acceptance of responsibility) would be 33.  The Guideline range for an offense level of 33 and a criminal history category of I would ordinarily be 135-168 months.  But, given the statutory maximum penalty of ten years, if Mr. Holt were permitted to plead to a single count, he would have a flat guideline of 120 months.  In short, based upon two amendments that lacked any empirical study, a first time offender with no prior criminal history guidelined at the statutory maximum sentence.

On September 30, 1996, Congress amended 18 U.S.C. § 2251 to increase the maximum penalty to twenty years, and to create a mandatory minimum penalty of ten years.  *See* Child Pornography Prevention Act of 1996, 1997, Pub. L. 104-208.  While this Congressional action increased the statutory penalties for individuals convicted of violating 18 U.S.C. § 2251, for the next seven years, the Commission added only one enhancement to Section 2G2.1, an enhancement inapplicable to Mr. Holt's case.  *See* Amendment 592, effective November 1, 2000 (providing for a two-level enhancement in cases where the perpetrator misrepresented his or her identity).

The Passage of the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (the "PROTECT Act"), Pub. L. 108-21, and the Commission's reaction to it, changed everything dramatically.  Through the PROTECT

Act, Congress raised both the minimum and maximum penalties for violations of 18 U.S.C. § 2251, to 15 years and 30 years respectively.   While the PROTECT Act specifically directed the Commission to make certain changes to certain guidelines, it did not command the Commission to make any changes to Section 2G2.1.

Even though the PROTECT Act did not direct the Commission to make any changes to Section 2G2.1, the Commission drastically rewrote that guideline.  First, it raised the base offense level from 27 to 32.  See Amendment 664, effective November 1, 2004.  As the sole justification for this change, the Commission cites the PROTECT Act's increase of the mandatory minimum from ten to fifteen years.  See *id.*, Reasons for Amendment.   In rationalizing the increase in the base offense level, however, the Commission points out a fundamental flaw in Section 2G2.1; namely, many of the enhancements will apply in virtually every case.  See *id.* ("A base offense level of 32 is appropriate for production offenses because, combined with the application of several specific offense characteristics **that are expected to apply in almost every production case** (e.g., age of the victim), this base offense level will ensure that the 15 year mandatory minimum (180 months) will be met [] by the Chapter Two calculations [in] almost every case.") (emphasis added).

In addition to the base offense level increase, the amendment added three specific offense level characteristics.  First, the Commission added a two-level increase if the offense involved the commission of a sex act or sexual contact, and a four-level increase if the offense involved a sex act and conduct described in 18 U.S.C. § 2241(a) or (b).  *See id.*  Second, the Commission added a two-level enhancement for those individuals who distributed the pornography, regardless of whether the distribution was to one person or

to millions.  See *id.*  Finally, the Commission added a four-level enhancement if the offense involved material portraying sadistic or masochistic images.  *See id.*

As the sole justification for these three enhancements, the Commission stated that conduct involving sexual contact, distribution, and sadistic or masochistic images was more serious than production conduct not involving one or more of these actions.  *See id.*  While such a statement may be true, the Commission failed to analyze: (1) whether the combination of these enhancements with the additional five-level increase in the base offense level created a sentence that was disproportionately high, or (2) whether one or more of these enhancements would apply in nearly every production case, thereby effectively raising the sentence for nearly every production defendant.  Indeed, the Commission could just have logically concluded that those defendants who produced pornography without sexual contact (or without distribution, or without sadistic or masochistic images) should receive a reduction from the newly increased base offense level.  Such a change would have recognized the distinction between those producers who touch their victims and those who do not (or those who distribute images and those who do not, or those who engage in sadistic and masochistic conduct and those who do not), without creating a de facto statutory maximum guideline range for the majority of pornography production defendants.

Thus, individuals like Mr. Holt would see their guideline range increase from 70-97 months in 1987, to 135-168 months in 1996, to a life sentence in 2004.  This increase occurred without empirical study and without the Commission ever concluding that pornography production defendants were receiving extraordinarily light sentences.  As a

result, because the advice is not grounded or based on expertise, the advice can be afforded less deference by this Court.

**B.      In addition to creating disproportionately unfair penalties, Section 2G2.1 fosters unwarranted uniformity in penalty.**

As detailed above, the Commission has dramatically increased the penalty under Section 2G2.1 without providing any real justification for the increase.  As a result, individuals like Mr. Holt now guideline at life imprisonment despite: (1) having no prior criminal record, and (2) accepting responsibility for their actions.  In contrast, an individual in criminal history category VI, whose offense conduct includes murder in the first degree, would face a lower guideline range provided he pled guilty and accepted responsibility for his actions. **Regardless of how heinous one views production of child pornography, it is hard to justify placing a Criminal History Category I child pornography defendant in a higher guideline range than a Criminal History Category VI first degree murderer**.

Moreover, the bracket inflation in Section 2G2.1 has essentially created an unwarranted uniformity amongst defendants convicted of pornography production.  The Commission itself has realized that many enhancements will apply to nearly every defendant.  *See* Amendment 664, Reasons for Amendment ("A base offense level of 32 is appropriate for production offenses because, combined with the application of several specific offense characteristics that are expected to apply in almost every production case (e.g., age of the victim), this base offense level will ensure that the 15 year mandatory minimum (180 months) will be met [] by the Chapter Two calculations [in] almost every case.").

Section 2G2.1 leads the majority of convicted pornography producers to face guideline sentences at or near the statutory maximum sentence.  This occurs regardless of whether the defendant has any prior criminal history and regardless of whether he has taken responsibility for his actions.  Thus, far from avoiding unwarranted disparity, Section 2G2.1 creates **unwarranted uniformity**.  Accordingly, it deserves less deference and, in the instant case, should be rejected.

> **C.**    **Due to the unwarranted bracket inflation, in this case and many others, Section 2G2.1 fails to give any credit for a defendant's acceptance of responsibility.**

The PSR cites and applies Guideline Section 5G1.2 in this case.  *See* PSR at ¶ 149.  Under Section 5G1.2, where the statutorily authorized maximum sentence on all counts of conviction is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentences shall be considered the guideline sentence and shall be imposed consecutively.  Meaning, of course, that a sentence below the statutory maximum would be considered a departure or variant sentence.  While the import of Section 5G1.2 is simply that a Court cannot exceed the statutorily authorized maximum sentence, there is an additional implication for defendants concerning Section 3E1.1 and the interaction between Section 5G1.2 and the legitimate societal interests in providing a lower sentencing recommendation for having agreed to plead guilty and accept responsibility for one's actions.

In *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995), the sentencing court was presented with a similar issue.  In that case, the defendant, after accepting responsibility, faced a guideline range of 135-168 months.  *Id.* at 640.  But, the statutory maximum sentence was 48 months (four years) on each of two separate counts of

conviction (for a total possible sentence of eight years).  *Id.*  Because the guideline range exceeded the maximum possible sentence, the guideline range became the statutory maximum sentence of 96 months.  *Id.*

At sentencing, Mr. "Rodriguez argued that, to ensure that his acceptance of responsibility was reflected in his actual sentence, the district court should apply the three-level adjustment from a baseline of the statutory maximum rather than from the base offense level as dictated by the guidelines."  *Id.*  The district court agreed that Mr. Rodriguez received no benefit for his acceptance of responsibility.  *Id.* at 641. Nonetheless, under the mandatory guideline system in effect at the time, the district court found that it had no authority to depart from the guideline range, and imposed the 96 month statutory maximum sentence.  *Id.*

On appeal, the Eleventh Circuit reversed.  The Court explained that "[a] defendant's acceptance of responsibility is a circumstance that the guidelines clearly and explicitly consider."  *Id.* at 643.  But, the Court found "no evidence in the sentencing guidelines, policy statements, or commentary of the Commission that it considered, or recognized the implications of, the interaction of § 5G1.1(a) and § 3E1.1 in cases such as this."  *Id.*  As a result, "[a] departure from the sentence prescribed by § 5G1.1(a) when the defendant's acceptance of responsibility has not been duly recognized is consistent with the goals of the guidelines."  *Id.*  Indeed, failure to grant a departure could "undermine the 'legitimate societal interests' served by the [acceptance of responsibility] adjustment." *Id.*  Thus, the Court, operating under a then-mandatory Guideline regime, determined that the district court had the authority to depart downward to give Mr. Rodriguez the benefit for his acceptance of responsibility.  *Id.*

Here, Mr. Holt has accepted responsibility for his actions.  He has pled guilty and saved the government and the Court the expense of such a trial.  Nonetheless, had he gone to trial, put the victims through the ordeal that such a trial would bring, and roundly declared that he was within his right to have sex with a minor, he would face the same guideline range.  Under the advisory guideline system that is now in effect, this Court should vary downward in recognition of Mr. Holt's acceptance of responsibility.

**D.    Courts have begun to take notice of the defective nature of Section 2G2.1.**

Courts have begun to take notice of the defects in the guideline applicable here, Section 2G2.1.  In *United States v. Jacob*, 631 F. Supp.2d 1099 (N.D. Iowa 2009), the Court reasoned that many of the flaws present in Section 2G2.2 were also present in Section 2G2.1.  *Id.* at 1115.  Specifically, Section 2G2.1:

> recommends enhancements for conduct present in nearly every case to which the guideline would apply: a two- or four-level enhancement in § 2G2.1(b)(1) based on the age of the minor involved; a two-level enhancement in § 2G2.1(b)(3) if the offense involved distribution; a four-level enhancement in § 2G2.1(b)(4) if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence . . .; and the two-level increase in § 2G2.1(b)(6)(B) for use of a computer or an interactive computer service to entice the minor.

*Id.*  As a result, the Court rejected Section 2G2.1 on categorical, policy grounds.  *Id.* Recognizing that Section 2G2.1 resulted in "an excessive sentence in this case," the Court varied downward.  *Id.*; *cf. United States v. Krueger*, 2009 WL 4164122, at *3-4 (E.D. Wis. Nov. 23, 2009) (while refusing to categorically reject Section 2G2.1, recognizing that Section 2G2.1 "contains some of the same specific enhancements as § 2G2.2, which can skew sentences upward," and in the end imposing a downward variant sentence).

In *United States v. Zauner*, 688 F.3d 426 (8th Cir. 2012), Judge Bright, in a concurring opinion, noted the defects of Section 2G2.1.  According to Judge Bright, "the guidelines routinely place defendants near or over the statutory-maximum sentence, eliminating any meaningful distinction between the least and most culpable offenders." *Id.* at 431.  As a result, "in cases such as this, where the guidelines obviously do not fit, a sentencing judge should give careful assessment to the sentencing requirements of § 3553(a) and state the judge's reasons and conclusions on the record."  *Id.*

While the number of published opinions attacking Section 2G2.1 are less than those attacking Section 2G2.2, statistical data supports the conclusion that judges are recognizing that Section 2G2.1 routinely results in a sentence at odds with Section 3553(a).  Indeed, between the Supreme Court's 2007 Gall opinion and October 12, 2011, courts imposed below guideline range sentences in approximately one-third of pornography production cases.  *See* Prepared Testimony of Judge Patti B. Saris, Chair, United States Sentencing Commission, Before the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, United States House of Representatives (October 12, 2011), available at 24 Fed. Sent. R. 145 (December 2011).

Further, in FY 2015, there were 415 sentences imposed under Guideline Section 2G2.1. See U.S.S.C., Sourcebook of Federal Sentencing Statistics at Table 28 (2015).[4] Of those, only 175 (42.2%) involved a within-Guideline sentence.  *Id.*  Conversely, 108 (26%) received a below-guideline sentence that was not government sponsored; the

---

[4]   *Available at*  http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2015/Table28.pdf

figure increases to 231 (55.7%) if one includes government-sponsored below-range sentences. *Id.*

Because Section 2G2.1 results in a sentence at odds with the goals of sentencing in this case, the Court should reject the recommended range and vary downward.

## CONCLUSION

WHEREFORE, Mr. Holt asks this Court to impose a sentence of <u>300 months (25 years) imprisonment</u>, followed by <u>lifetime supervised release</u>.

After considering the history and characteristics of Mr. Holt and the nature and circumstance of this case, that is the most appropriate sentence. 18 U.S.C. § 3553(a)(1). Such a sentence is sufficient but not greater than necessary (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/ David E. Johnson
David E. Johnson
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
David_Johnson@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2016, I electronically filed the foregoing

## MOTION FOR BELOW-GUIDELINE, DOWNWARD VARIANCE SENTENCE

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Judith A. Smith, Assistant U.S. Attorney
Email: Judith.Smith3@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Mr. Matthew Scott Holt *(via U.S. Mail)*

s/ David E. Johnson
David E. Johnson
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
David_Johnson@fd.org
Attorney for Defendant